FILED
2008 NOV 25 AM 10: 15
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEW YORK LIFE INSURANCE COMPANY, a New York Corporation,<br><br>　　　　　　　　　　　Plaintiff,<br>vs.<br>ILDEFONSO MORALES, ALICIA A. RUIZ DE MORALES and JUAN JAVIER LOPEZ,<br><br>　　　　　　　　　　　Defendants. | CASE NO. 06 CV 1022-B<br><br>OPINION |

　　　　This interpleader action came on for non-jury trial on Tuesday, October 28, concluding on Friday, October 31, 2008. After reviewing all documentary evidence presented, hearing and reviewing the testimony of six witnesses in open Court, having studied the Mexican final Judgment of Conviction, and having studied all briefs and pleadings of the parties and hearing their oral summations, the Court has concluded that the policy proceeds described herein should be and are to be awarded to Contestant-Cross Complainants Ildefonso Morales and Alicia A. Ruiz De Morales, for the reasons set forth here-below in this OPINION.

## STATEMENT OF THE CASE

On May 1, 1997, New York Life Insurance Company (hereafter life insurance company) issued its Whole Life Policy No. 46033984 insuring the life of Maria F. Lopez (hereafter Maria) in the face amount of $100,000. The owner is Juan Javier Lopez, Spouse of Insured (hereafter Lopez). The First Beneficiary listed is Lopez; the Second Beneficiary – Children born of marriage of insured to Lopez. The said insurance policy was in full force and effect on February 19, 1998, the date of death of the Insured, Maria.

Timely demand for payment in accordance with the policy terms was made by the First Beneficiary Lopez, a Mexican domicile.

Timely demand for payment in accordance with the policy terms and applicable law was also made by the natural parents of Maria, Mr. Ildefonso Morales and Mrs. Alicia A. Ruiz Morales, both citizens and domiciles of California.

Being unable to determine under the law to whom New York Life Insurance Company (hereafter Insurer) owes payment of the above policy proceeds, Insurer commenced this action under 28 U.S.C. §1335 and deposited the proceeds of the insurance policy plus applicable interest accruing thereon with this Court. The Insurer was awarded the Court's Order Granting Plaintiff's Motion for Discharge and Award of Costs and Attorney's Fees on October 13, 2006. Attorneys' fees of $14,521.00 were awarded to New York Life on December 5, 2006, and Court costs to be determined by the Clerk's Office. Judgment of Interpleader Discharging New York Life Insurance Company was filed.

Thereafter, Lopez filed Cross-complaint for policy proceeds as the named beneficiary, and Mr. And Mrs. Morales filed Cross-complaint for the same policy proceeds as contestants to the policy based on the allegation that Lopez had feloniously and intentionally killed Maria, disabling him from recovering the policy proceeds under California Probate Code §254(b) et. seq.

## SUMMARY OF FACTS

On February 19, 1998, Maria was assaulted and killed after 1:55 p.m. and before 2:24 p.m. in the home of herself and her husband Lopez. (Undisputed).

       There were numerous calls in that time frame. According to telephone records of the Lopez home, and of witnesses to calls, Maria called the beauty salon CHOLOS at 1:35 p.m. regarding a 1:30 p.m. appointment Maria had, telling the employees Lorena Ortega and Maria Valles Fernandez that she would arrive late because she was waiting for someone to pick her up. The Lopez telephone records record that call precisely at 1:27:44 p.m. Shortly thereafter, at precisely 1:40:29 p.m. the Lopez telephone records show a call from the Lopez home to Lopez' cell phone. At about that time Lopez departed the Farmaco office hurriedly.

       Thereafter, as shown by the cell phone records of a customer Reyes, a cell call was made from Reyes to the cell phone of Lopez regarding a request for medicines, at precisely 1:53:57 p.m. In this call, Reyes testified Lopez told him he was en route home in his car and he would contact Reyes later.

       Finally, the Lopez cell phone TELCEL Company reflects a call from Lopez to Maria at the Lopez home at 1:55:40 p.m. which was confirmed by Lopez himself in the Court hearing of 17 December 1998. In this call Lopez testified Maria answered in an apparently normal state.

       By written statement of Lopez, (Ex. 102, p. 12 of 34), he arrived home at approximately 2:05 p.m. and by his remote, he opened his garage door and entered his house. Lopez estimated the time to drive from his employment was approximately 10 minutes.

       Next door neighbor Rubi Espinoza estimates seeing the Lopez garage door open a few minutes before 2:00 p.m. and the Lopez' White Suburban not in the garage.

       By Lopez' statement he stated that upon his arrival at home the garage driveway was blocked by a third person's vehicle, so he could not park in his driveway. The neighbor did not see the Lopez' Suburban vehicle when he departed his home just before 2:00 p.m. that day.

       From these records and statements the Court concludes by a preponderance of evidence that Lopez was at home with Maria shortly after 1:55:43 p.m., and no later than approximately 2:00 p.m., at which time Maria had not yet been attacked.

       The next documented time of relevance is 2:24:30 p.m., when Lopez from his home, called his cousin Francisco Javier Rubio Lopez at the Farmaco Distribudora Office where

1  Francisco was also employed. In that call, sounding upset, Lopez advised Francisco that Maria
2  had been injured and asked him to come to his house immediately.  According to Lopez'
3  mother, Ms. Rosa Irma, an owner of Farmaco, Lopez also called her at the office about three
4  minutes after Francisco ran out of the office immediately after his brief 2:24:30 telephone call
5  from Lopez; she talked less than two minutes with Lopez, hung up the phone, ran out of the
6  office and contacted Abel (an employee) to drive her to Lopez' home as quickly as possible.
7  She arrived sometime before 2:35 p.m. because she called the Farmaco office from the Lopez
8  home at that time.  From this documentary evidence the Court concludes Maria was fatally
9  attacked sometime between 1:55 p.m. and 2:24 p.m.
10          There is no dispute that Maria and Lopez were alone together in their home at this time.
11          There is a plethora of physical and testimonial evidence of what happened thereafter.
12  Francisco arrived at the Lopez home at approximately 2:30 p.m.; shortly thereafter Rosa Irma
13  arrived and at 2:35 p.m. Rosa Irma called her office to tell an employee Dulce Cristina
14  Mendoza Luna that Maria was bleeding and appeared to be in serious condition, and requested
15  Dulce to call an ambulance.  This call was registered as having been made from the Lopez
16  home.
17          The records also show that a residential alarm was initiated by Lopez and Francisco at
18  the Lopez residence at 2:33 p.m. indicating burglary through the front door, and a sensor
19  noting movement.  An employee of the alarm company phoned the Lopez home to verify the
20  alarm was not unintentional.  He hung up shortly, called the Red Cross and the Municipal
21  Police, and immediately drove to the Lopez home, arriving approximately six minutes from
22  departure.  The evidence, without dispute, shows that Lopez and Francisco set and then
23  activated the alarm after Francisco's arrival, which required all doors and windows to be
24  closed in order to be activated.  There is no claim of an earlier call for help than recited above.
25          The physical exam of Lopez, obtained within an hour or so, revealed three recent (fresh)
26  excoriations (scratches); two on the right side of Lopez' neck, and one on a finger of Lopez'
27  left hand. Post-mortem Expert examination of Maria at the hospital within 2-4 hours revealed,
28  among other extensive evidence of mortal injury, epithelial tissue under fingernails of Maria.

1  Epithelial tissue is superficial (surface) layer of human skin. The excoriations examined on
2  Lopez were considered by government expert witnesses in the trial as consistent with
3  production of the epithelial tissue found under Maria's fingernails, and the Court concludes
4  by a preponderance of the evidence that those skin tissue samples were produced by a struggle
5  between Maria and Lopez during his attack on her. Hair found under Maria's fingernails was
6  found by the government expert as similar to hair of Lopez, although a defense expert testified
7  without any facts relied on, that it was <u>not</u> hair from Lopez.

8        There is no dispute that the approximately twelve puncture wounds on Maria were
9  caused by knife and ice pick thrusts, and that death was a direct result of the massive blood loss
10 caused by those stabbing wounds. At the time of the attack Maria was eight months pregnant.
11 The loss of the baby was considered possibly avoidable had Maria received immediate drastic
12 effort to remove the fetus, but that was not received. The child died as well. It appears Maria
13 had died before she was removed from the house, which occurred at approximately 2:45 p.m.
14 Maria was not observed by any of the witnesses first responding, to be conscious.

15       There is undisputed evidence of the presence of blood tracks on the interior and exterior
16 door handle for the exterior kitchen door, but the lock was functional. Blood tracks were
17 found on the stairway to the bedrooms, and there was disarray in the master bedroom, with
18 female clothing scattered around the floor with some blood spots on that clothing.

19       In the second bedroom a floor safe exists in the closet. This safe was open, and some
20 jewelry boxes were present but empty. Other jewelry boxes in the master bedroom contained
21 jewelry. Lopez claimed he had $2400 cash in the safe and some jewels, all of which were
22 missing. There is no evidence of any recovery of cash or jewels. Lopez kept the safe
23 unlocked.

24       There was extensive blood and blood pooling all over the living room, and some
25 furniture was disturbed, including a large flat-screen T.V. which had been moved slightly, and
26 which had blood smears on the back of the T.V. Lopez had blood spattering and blood stains
27 on his shirt and pants. There was no report regarding blood smears on his shoes. At one point,
28 Rosa Irma saw Lopez kneeling on the living room floor holding Maria.

Police investigators examined the interior and the exterior of the Lopez home. It had rained earlier in the morning of the incident, but there were no foot tracks in dirt or ground cover anywhere around the Lopez yard. That rear yard is enclosed completely by a wall approximately six-feet high, and there were no marks observed anywhere along that wall. The kitchen door handle had been dented as if forcible entry had been attempted but the latch mechanism was undamaged as was the door area. Investigators concluded there had been no forced entry through the kitchen door. The experts found smearing of blood on the interior and the exterior of the door handle.

The government did not obtain DNA testing in this case, and no request for DNA testing was requested by Lopez until three years after the incident. At that time the epithelial tissue sample which had been examined by both parties soon after the incident, and was in evidence, was missing and was not ever found thereafter.

It is undisputed that on the day of the incident, Maria had missed a hair appointment of 1:30 p.m.; that she called the hair salon at 1:35 p.m. to tell them she would be late because she was waiting for someone to pick her up. (Maria was not driving because of her advanced state of pregnancy), and she was told the salon would take her when she could get there. The phone record reflects a cell phone call to Lopez' cell at 1:40:29 from the Lopez home, which was placed by Maria immediately after she had re-arranged her hair appointment for that afternoon.

Claudia Ibeth Morales Ruiz, sister of Maria, testified that she was present on numerous occasions when Maria and Lopez had verbal arguments over disagreements. Lopez testified he never had any disagreements with Maria, and that they were very happy and looking forward to the birth of their first child.

Investigators concluded there was no forced entry into the Lopez home at any time, let alone between 1:55 p.m. and 2:24 p.m. on February 19. The only person that was in Maria's presence between those times was Lopez, and he was in her presence for approximately 28 minutes before he called Francisco to report Maria's injuries. There were two kitchen knives of blade length in excess of six inches and one ice pick found in the living room of the Lopez home. Maria's injuries were all stabbing wounds to her torso, front and some in the side. The

1 | Court finds by a preponderance of the totality of the evidence that Maria was stabbed to death
2 | by Lopez between 1:55 p.m. and 2:24 p.m., and that such stabbing was felonious and
3 | intentional with the purpose of killing her.

## STATEMENT OF LAW

1) The Court has subject matter and personal jurisdiction over the cross-complainant parties by virtue of 28 U.S.C. §1335(a)(1).

2) The case is in the nature of a diversity action; therefore the substantive law of California shall apply, and federal procedure shall apply to the trial procedures. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

3) California Probate Code § 252 provides in pertinent part as follows:

"A named beneficiary of a ... life insurance policy ... who feloniously and intentionally kills the ...person upon whose life the policy is issued is not entitled to any benefit under the...policy,...and it becomes payable as though the killer had predeceased the decedent."

4) Judgment of a foreign court adjudicating guilt of a beneficiary of life insurance of felonious unintentional killing is not conclusive in this Court so as to control judgment in this case.

California Probate Code § 254(a) provides as follows:

"(a) A final judgment of conviction of a felonious and intentional killing is conclusive for purposes of this part."

(b) In the absence of a final judgment of conviction of felonious and intentional killing, the court may determine by a preponderance of evidence whether the killing was felonious and intentional for purposes of this part. The burden of proof is on the party seeking to establish that the killing was felonious and intentional for the purposes of this part. (Operative July 1, 1991).

In Haung Tang & Aetna Life Insurance Co., 523 F.2d 811 (9th Cir. 1975), the Court held that Cal. Probate code § 258 (1992) disentitling a beneficiary of

benefit from the death of a victim of the beneficiary's felonious and intentional killing did not conclusively preclude the alleged perpetrator convicted by a foreign country.

In <u>Principal Life Insurance Co. V. Scott Peterson</u>, 156 Cal.App.4th 676, 687 __Cal.Rptr.3d__(October 2007), where a California trial court conviction was on appeal at the time of the insurance interpleader action, the Court held that the non-final judgment of conviction was not conclusive, and the Court may determine the issue pursuant to Cal.Probate Code § 254(b). In such an action, the trial Court may consider the foreign judgment as evidence of the issue to the extent it is relevant.

In this case Lopez was accused and tried for intentional homicide aggravated by reason of non-consanguinity in the State Court system of Tijuana, Mexico.. Lopez was represented at all times by his private attorney with full right to present defense evidence and cross-examine all witnesses, and the trial proceeded on his plea of not guilty. The actual trial proceedings covered approximately five years, mostly due to the numerous – at least ten – interlocutory appeals filed by Lopez each of which required the proceedings to stop until those appeals were resolved. The actual evidentiary hearings were usually conducted by a certified judicial officer for the Court, an attorney at law but not a judge; who is titled "Secretary of Agreements."On some of the evidentiary hearings the judge on the case presided personally. At the conclusion of the trial, which comprised approximately twelve separate evidentiary hearings over the five-year period, the Secretary of Agreements who presided, assembled a lengthy judgment of the case which summarizes all the testimony and exhibits as part of the judgment itself. This entire judgment was then reviewed by the judge in the case personally, and signed by the judge. The judge personally found Lopez guilty and sentenced him to serve 15 years in La Mesa Prison for aggravated homicide by reason of non-consanguinity (no family blood relationship).

This Court received a certified and authenticated copy of the judgment in Spanish (Ex. 100), as well as a 35-page certified and authenticated copy in English of the portions of the

judgment which reported the testimony of witnesses and the contents of documents, all of which are also on file in the Court records of this case in Tijuana Common Courts (Ex. 102). The judgment and sentence was also appealed to the Federal Court of Mexico, where it was affirmed. The judgment is final.

THEREFORE, this Court holds that although the evidence summarized in the Judgment of the Mexican court may be considered by this Court in its discretion, such judgment is not conclusive, and the contestant-cross complainants Morales have the burden of proof to establish by a preponderance of the evidence that Lopez feloniously and intentionally killed his spouse Maria.

5) As used in Cal.Prob.Code § 254, "feloniously" refers to criminal conduct which is punishable by death or by imprisonment in the state prison. Cal. Penal Code § 17, "intentional" refers to knowing, intentional purpose at the time of the act, and is manifested by the circumstances committed with the offense. See Cal. Penal Code §§ 20, 21.

6) Relevant public records of Judicial proceedings may be admitted along with all other relevant and admissible evidence, even though not conclusive of the issue in and of itself alone. Federal Rules of Evidence, § 22.

To the extent evidence is stated under the law section, it is to be considered as a fact found to the extent it applies, vice versa where legal conclusions may be drawn under the factual summary.

IT IS HEREBY ORDERED:

Unless waived by all parties, contestant Cross-complainants Ildefonso Morales and Alicia A. Ruiz De Morales shall prepare, serve and file Proposed Findings of Facts and Conclusions of Law by December 19, 2008; beneficiary Cross-complainant shall have until January 9, 2009 to object or supplement the proposed findings and conclusions.

WHEREUPON, they shall be submitted and the Court will prepare settled Findings, Conclusions and Judgment in accordance with this OPINION.

Dated: November 24, 2008

Honorable Rudi M. Brewster
United States Senior District Court Judge